**NOT FOR PUBLICATION**



## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No.   CC-13-1494-KiTaD |
| MERUELO MADDUX PROPERTIES, INC., | Bk. No.   1:09-13356-VK |
| Debtor. | |
| RICHARD MERUELO, | |
| Appellant, | |
| v. | **M E M O R A N D U M**[1] |
| REORGANIZED MERUELO MADDUX PROPERTIES, INC., | |
| Appellee. | |

Argued and Submitted on June 26, 2014,
at Pasadena, California

Filed - August 20, 2014

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Victoria S. Kaufman, Bankruptcy Judge, Presiding

Appearances:     Aimee Dominguez, Esq. of Dominguez Alejo LLP argued for appellant Richard Meruelo; Christopher E. Prince, Esq. of Lesnick Prince & Pappas LLP argued for appellee Reorganized Meruelo Maddux Properties, Inc.

Before: KIRSCHER, TAYLOR and DUNN, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Richard Meruelo ("Meruelo") appeals an order denying his request for severance pay in connection with his postpetition termination from chapter 11[2] debtor, Meruelo Maddux Properties, Inc. ("Debtor"). Because the bankruptcy court applied an incorrect standard of law to Meruelo's severance claim, we VACATE and REMAND, in part.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Prepetition events

Meruelo, former CEO and Chairman of the Board of Directors for Debtor, entered into an Executive Employment Agreement with Debtor on January 30, 2007. It provided, among other things, a base salary of $450,000 and a mandatory annual bonus equal to fifty percent of the base ($225,000). The Employment Agreement had an initial three-year term, but would automatically renew for successive one-year terms, unless either party gave the required notice of non-renewal.

If Meruelo's employment terminated "without cause," he would receive a single lump-sum severance payment equal to three times the sum of (i) his base salary and (ii) the greater of (a) the bonus actually paid to him for the most recent completed fiscal year and (b) the minimum bonus that would have been paid during the fiscal year in which his employment was terminated. In short, Meruelo would receive at least $2,025,000.[3]

---

[2] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[3] An identical employment agreement for Debtor's President and COO, John Maddux ("Maddux"), was executed on the same day.

continue...

-2-

**B.    Postpetition events**

Debtor and its affiliated entities filed chapter 11 bankruptcy cases in March 2009, before the end of the initial term in Meruelo's Employment Agreement.  The cases were consolidated and jointly administered.  Debtor continued its usual operations, and Meruelo continued to serve as CEO.  Meruelo filed a proof of claim on September 23, 2009, and another one on March 7, 2012.

The initial term of Meruelo's Employment Agreement expired on January 30, 2010.  The Employment Agreement was not assumed, but Meruelo continued to work for Debtor.

**1.    The notice of non-renewal**

After the appointment of the Official Committee of Equity Holders ("OEC") and during the time that competing plans were being offered by Debtor and entities known as Charlestown Capital Advisors, LLC and Hartland Asset Management Corporation (collectively "Charlestown"), it became apparent to Debtor that if the Charlestown plan were approved, Meruelo would no longer be employed with the reorganized debtor and would hold a substantial claim as a result of his termination.  In particular, Meruelo would be entitled to a significant severance package if he were terminated during the Employment Agreement's term.

In a formal written demand sent to Debtor on September 21, 2010, the OEC's counsel noted that Meruelo's Employment Agreement would automatically renew for another one-year term (from January 31, 2011 to January 30, 2012) absent the delivery of a

_____

[3]...continue
Maddux sought the same severance claim as Meruelo.  He is not a party to this appeal, but we discuss him where necessary.

-3-

non-renewal notice by November 29, 2010. To avoid Meruelo's severance claim, the OEC demanded that Debtor issue a notice of non-renewal by September 29, 2010.

When Debtor, still under the control of Meruelo and Maddux, failed to issue the notice of non-renewal, the OEC sought standing to issue it. The OEC noted that if the Charlestown plan were confirmed, Meruelo would be terminated and such termination would be "without cause" per the terms of his Employment Agreement. In that case, Meruelo would hold a claim for severance. The OEC contended that if the non-renewal notice were timely issued, Meruelo's severance claim would be avoided because his employment would not be terminated during the employment term under the Employment Agreement. Failing to issue it, however, would result in Debtor being saddled with a substantial administrative expense for Meruelo's severance claim.

Debtor opposed the OEC's motion, contending that issuing the notice of non-renewal to Meruelo would qualify as a "good reason" for him to resign, thereby triggering a severance payment equal to "one times the sum" of his base salary plus the amount equal to the bonus he was paid the previous year. Likewise, a termination "without cause" would trigger a severance payment equal to "three times the sum" of his base salary plus the greater of the amount equal to the bonus he was paid the previous year or what he would have received in the year of his termination. Debtor contended the notice of non-renewal clause in the Employment Agreement permitted Debtor to terminate Meruelo's employment or at least to transition him to an "at will" employee, without such termination qualifying as one "without cause." However, argued Debtor, to

-4-

invoke this beneficial clause the executory Employment Agreement would first have to be assumed, a decision within Debtor's business judgment, not the OEC's, and which would require Debtor to cure all existing defaults, currently about $1 million in unpaid bonuses.

After two hearings on the matter, the bankruptcy court granted the OEC standing to issue the notice of non-renewal. The order expressly provided that the issuance of the non-renewal notice would not expand or restrict any party's right to dispute a claim asserted by Meruelo under the Employment Agreement including (a) any party's right to assert that his employment may be terminated for "cause" or (b) Meruelo's right to assert a claim under the Employment Agreement against the estate.

The OEC issued the notice of non-renewal to Meruelo on November 24, 2010. Despite the notice, Meruelo continued to work for Debtor until August 5, 2011, when he was officially terminated.

**2.    The Charlestown Plan and Meruelo's termination**

The bankruptcy court confirmed the Charlestown Plan. Per the Charlestown Plan and by operation of law, on July 25, 2011, Meruelo ceased to be employed by the reorganized debtor, EVOQ Properties, Inc. ("EVOQ"). On August 5, 2011, EVOQ issued to Meruelo a notice of termination, effective July 25, 2011. Enclosed was a check for the amount EVOQ maintained was Meruelo's accrued unpaid salary through August 5, as well as his unused vacation time through July 25. The termination notice advised Meruelo to file an administrative claim for any unpaid bonus compensation he felt he was entitled to.

### 3. Meruelo's motion to compel payment of wages and severance

In response to his termination, Meruelo filed a Motion for Order Compelling Debtors to Pay Administrative Expense and Prepetition Unsecured Wage Claims ("Motion to Compel Payment"). In short, Meruelo argued that EVOQ, per the Charlestown Plan, failed to pay his administrative expense and prepetition unsecured claim on the Effective Date, July 25, 2011. Meruelo argued he was entitled to no less than $450,000 in bonus wages for 2009 and 2010 ($225,000 for each year), a prorated bonus of $133,767 for 2011 (from January 31, 2011 to August 5, 2011, after the non-renewal notice and up to the termination date), at least $2,025,000 in severance pay, accrued and unused vacation wages, and other penalties and attorney's fees.[4] The Motion to Compel Payment did not distinguish whether the severance payment was considered a prepetition unsecured claim or an administrative expense. Nowhere in the motion were relevant Code sections referenced or discussed.

EVOQ opposed Meruelo's Motion to Compel Payment, arguing that Meruelo was not entitled to an administrative claim for his 2011 base salary, bonus and severance benefits under the Employment Agreement. The Employment Agreement no longer existed because it expired on January 30, 2011. As for Meruelo's prepetition claims, EVOQ argued that it had 180 days from the Effective Date of the

---

[4] Upon objection by several creditors to Meruelo's bonus wages for 2009, Judge Thompson issued a Memorandum Decision on July 6, 2009, determining that the issue of bonus wages to Meruelo and other Debtor executives was to be decided at a later date "upon further notice to creditors." All objections to payment of his salary were overruled. The 2009 bonus wages were later granted by Judge Kaufman on November 23, 2011.

Charlestown Plan to object to prepetition claims. Thus, Meruelo's request was premature.

In November 2011, the bankruptcy court granted the Motion to Compel Payment, in part, as to Meruelo's 2009 bonus claim. He was ultimately also awarded his 2010 bonus claim. In its arguments against Meruelo's remaining employment claims, EVOQ conceded that Meruelo was entitled to reasonable compensation for his services after the Employment Agreement expired, but argued he was not entitled to severance because once the Employment Agreement expired, the Term of Employment ended and the company was no longer liable for severance pay.

In June 2012, the bankruptcy court issued a scheduling order for Meruelo's remaining disputed employment claims: (1) his 2011 bonus claim for $133,767; and (2) his claim for severance pay.[5] The court ordered briefing and scheduled an evidentiary hearing.

Meruelo, pro se, filed his brief, which incorporated the arguments made in Maddux's brief on the same issue. Meruelo (as argued by Maddux) contended he was entitled to severance if he was terminated without cause during the "Term of Employment," which was defined in paragraph 3 of the Employment Agreement. While the "Term of Employment" included the three-year initial term and any one-year extended term, the Employment Agreement did not address when the "Term of Employment" technically ended. Meruelo argued that issue was answered in the last sentence of paragraph 3, which provided, "but the Term of Employment shall end upon any

---

[5] The bankruptcy court's ruling respecting the 2011 bonus claim is not at issue in this appeal, but we discuss it where necessary since it was decided with the severance claim.

-7-

termination of Executive's employment with Employer as herein provided." Arguably, the language did not say the Term of Employment ended when the initial term or extended term expired. Instead, argued Meruelo, the Term of Employment ended when the employment terminated, which implied that the Term of Employment was effective until he was officially terminated on August 5, 2011, not when the notice of non-renewal was sent in November 2010. Thus, the terms of the Employment Agreement were enforceable at the time he was terminated, and he was entitled to full severance.

Meruelo argued that he should get the severance he bargained for and not be in a worse position because he remained on the job, when he could have resigned upon the non-renewal notice and received the severance payment. Alternatively, if the court determined that the terms of the Employment Agreement were not contractually binding at the time of his termination, Meruelo argued he was entitled to a "reasonable" severance on a "quantum meruit" basis.

EVOQ argued that expiration of the Employment Agreement precluded any severance, and it disputed Meruelo's contention that the notice of non-renewal served no purpose, particularly when he and Maddux decided to not renew every other executive whose initial term was set to expire in January 2009 in order to avoid severance claims. EVOQ also disputed Meruelo's quantum meruit theory; it argued that quantum meruit applied only to the 2011 bonus because the parties had disputed what was the "reasonable value" of Meruelo's services. EVOQ distinguished the cases Meruelo claimed supported his quantum meruit theory for severance.

-8-

### 4. The evidentiary hearing and the bankruptcy court's ruling on the 2011 bonus and severance claims

At the start of the evidentiary hearing on the 2011 bonus and severance claims, the bankruptcy court confirmed with counsel for EVOQ that both claims were administrative expense claims. The court went on to say that such claims were "supposed to be necessary and beneficial," and that the burden was on the claimant to demonstrate the bonus and severance package was necessary to "keep them there." Hr'g Tr. (April 22, 2013) 12:1-4. The court then stated that the burden was on the claimant to "show the reasonableness of the compensation," particularly when the Employment Agreement was not controlling as it was not renewed. Id. at 12:13-13:1. It later ruled that the 2011 bonus and severance claims were not subject to the terms of the Employment Agreement because it had not been renewed; Meruelo was working without a contract during the period of January 31, 2011 through August 5, 2011.

Counsel for EVOQ then argued that because the Employment Agreement was not controlling, the court had to look at what was "reasonable," and Meruelo and Maddux had not presented any evidence as to what amount was reasonable. After further argument by EVOQ, counsel for Maddux argued:

> MR. SHEMANO: The Court mentioned that these claims are being asserted as administrative expense claims and really were these reasonable and necessary benefits to the estate. Let's just remember, we can call these -- we don't have to call these administrative expense claims; we can call these general unsecured claims.

Id. at 18:15-20. The bankruptcy court then noted again that the 2011 bonus and severance claims were brought as administrative

expense claims, but opined that even if they were considered unsecured claims, the burden was still on the claimant to show the amount requested was "reasonable" given that no contract was in effect. Id. at 22:11-23:5. In response, Maddux's counsel stated that the court did not need to get "fixated" on "whether these are administrative expense claims or not." Id. at 23:7-9. His client's case did "not stand or fall on whether we demonstrate benefit to the estate." Id. at 23:19-20.

After further argument from counsel, the bankruptcy court expressed its view about the severance claim:

> The agreements were not renewed. They waived their right to severance. They could have collected it and left and said, you know what, go ahead with that other plan. But instead, they decided, we're going to shoot for keeping the company in our control.
>
> . . .
>
> I don't have any evidence that this is reasonable. I don't think it is reasonable. I don't understand why that would be reasonable . . . .
>
> . . .
>
> They -- I don't think its reasonable. I think it's their burden to show it's reasonable.
>
> . . .
>
> No, it is not reasonable for people who stayed on after the agreements were not renewed to simply assume in the absence of an approved -- court-approved employment agreement -- they didn't ask for severance in their insider comp forms.
>
> . . .
>
> Well, I don't think there's any record it's reasonable. There's no record it's reasonable. None, zero. I mean, you may say that, well, we have a record that since the Court approved the 2009 bonuses and 2010 bonuses maybe the Court should approve (indiscernible), but no court ever approved the severance . . . . It was never litigated.

. . .

Okay. So I just don't think it's reasonable to expect you to collect severance pay when there was all this litigation about the fact that you were going to get a notice of non-renewal to cut off your right to severance pay.

. . .

There's no . . . evidence that the severance amount is reasonable, none. No evidence that it's reasonable. I mean, you're saying based on a 2007 contract provided for three times when he knew that there was a notice of non-renewal and that this was the main focus of it and -- you know, he -- there's just no evidence that it's -- in this context that it's reasonable.

. . .

There's no evidence that somebody else would have required three years of severance or they would have agreed to pay three years of severance.

Id. at 38:1-5; 39:13-16; 39:20-22; 40:6-10; 40:21-41:3; 42:5-9; 51:5-13; 51:21-23. In response, counsel for Maddux argued:

MR. SHEMANO: Your Honor, we say under § 502(b)(4) this Court can do what it wants as a court of equity of reasonableness. If this Court thinks three times [the base salary] is not reasonable, we live or die with that. Like I said, we -- that's what our papers say.

Id. at 51:24-52:3. Upon further discussion, the following colloquy ensued:

MR. SHEMANO: Your Honor, again, the point is, when they negotiated it . . . this is a package. Okay. And if you -- if the Court thinks the value is zero under quantum meruit, I think the Court is making a mistake. I -- if the Court said it's not two million dollars, I can't argue with the Court. I think there's a number between zero and two million that based upon the facts and circumstances this Court should --

THE COURT: I'm not picking numbers out of the sky.

MR. SHEMANO: -- choose --

THE COURT: I mean, you know, I'm just -- it's not --

MR. SHEMANO: Well, all right, now, I will --

-11-

THE COURT: Three times is unreasonable. There's no evidence it's reasonable. The fact that it's in a contract that was negotiated three years before . . . .

Id. at 54:5-21.

After further argument from counsel, the bankruptcy court announced its oral ruling denying the severance claim in its entirety:

I don't think [the severance amount is] reasonable or appropriate on quantum meruit grounds that that severance amount in that contract, which was not renewed.

And I think whether it's administrative or unsecured, it's the claimant's ultimate burden on showing it as being reasonable and appropriate and payable and I don't see it where an agreement wasn't renewed, and for all of the reasons I've articulated. So I think the case is [sic] that look at severance are distinguishable on the specific facts of this case, and so no severance.

Id. at 75:18-76:2.

The bankruptcy court entered an order allowing Meruelo's 2011 bonus claim but denying his claim for severance ("Compel Order"). The Compel Order was silent as to what authority the bankruptcy court relied upon for its decision. On September 24, 2013, the court entered an order for attorney's fees in connection with Meruelo's and Maddux's employment claims. Although they were determined to be the prevailing parties, because Meruelo had no attorney's fees or expenses, he was awarded nothing. This timely appeal followed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUE

Did the bankruptcy court abuse its discretion by applying an incorrect standard of law to Meruelo's severance claim?

-12-

## IV. STANDARD OF REVIEW

We review the bankruptcy court's order allowing or disallowing an administrative claim for abuse of discretion. Gonzales v. Gottlieb (In re Metro Fulfillment, Inc.), 294 B.R. 306, 309 (9th Cir. BAP 2003)(citing Teamsters Indus. Sec. Fund v. World Sales, Inc. (In re World Sales, Inc.), 183 B.R. 872, 875 (9th Cir. BAP 1995)). A bankruptcy court abuses its discretion if it applies an incorrect legal standard or its factual findings are illogical, implausible or without support from evidence in the record. TrafficSchool.com v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

## V. DISCUSSION

**The bankruptcy court abused its discretion by applying an incorrect standard of law to the severance claim.**

We start by briefly recapping the pertinent facts of this case. Meruelo's Employment Agreement, which no one disputes was an executory contract, was executed in January 2007. It was still in effect when Debtor filed its chapter 11 cases in 2009, as the initial term of the Employment Agreement did not end until January 30, 2010. The Employment Agreement was not assumed or rejected prior to confirmation, but the parties apparently believed that it renewed for one more year from January 31, 2010 to January 30, 2011. The OEC acted as though it had renewed, which explained its belief that a notice of non-renewal was needed by November 29, 2010, to satisfy the 60-day notice requirement. The bankruptcy court also noted at the evidentiary hearing that the Employment Agreement automatically renewed for one more year in January 2010.

-13-

The bankruptcy court did not enter written findings and conclusions, nor state its analysis with any particularity at the evidentiary hearing. The court determined: that the Employment Agreement had not been renewed after January 2011 and had expired prior to Meruelo's termination in August 2011; and that the amount of his severance claim was not reasonable. The court, however, never stated any statutory or case law authority for its decision.

The bankruptcy court stated during its oral ruling that whether the severance claim was an administrative expense or an unsecured claim, the claimant had the burden to prove the amount was "reasonable." The court also stated that it had distinguished the "quantum meruit" cases cited by Maddux (and thus Meruelo), but did not say on what basis. Adding to the confusion, Meruelo argued in the Motion to Compel Payment that the severance claim was an administrative expense, but later argued (through Maddux) that such claim could be treated as either an administrative expense or an unsecured claim under § 502(b)(4). Meruelo had filed both a proof of claim and the Motion to Compel Payment, which functioned as a motion to allow an administrative expense claim. The Compel Order, drafted by counsel, does not state under what authority the severance claim was being denied.

Section 502(b)(4) provides for the allowance of a claim over objection "except to the extent that . . . if such claim is for services of an insider . . . such claim exceeds the reasonable value of such services." Thus, an insider's claim for services under § 502(b)(4) is subject to a "reasonableness" standard. See The Margulies Law Firm, APLC v. Placide (In re Placide), 459 B.R. 64, 72 (9th Cir. BAP 2011). However, such claims are only for the

-14-

insider's services rendered and unpaid at the time of the filing of the petition. 4 COLLIER ON BANKRUPTCY ¶ 502.03[5][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012). In other words, § 502(b)(4) applies to <u>prepetition</u> claims. Since the claims at issue here were for Meruelo's 2011 bonus, which was for services rendered postpetition, and the severance claim, which accrued postpetition, they were not for prepetition claims. Therefore, if the bankruptcy court applied § 502(b)(4), it abused its discretion.

Section 503(b)(1)(A)(i) provides that administrative expenses include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, and commissions for services rendered after the commencement of the case[.]" The burden of proving an administrative expense claim is on the claimant. <u>Einstein/Noah Bagel Corp. v. Smith (In re BCE West, L.P.)</u>, 319 F.3d 1166, 1172 (9th Cir. 2003).

The Ninth Circuit has afforded administrative expense priority for certain types of severance pay for employees who provided postpetition services. The rule is that "pay at termination in lieu of notice" is considered an administrative expense, but "pay at termination based upon length of employment" is not. <u>See</u> <u>Teamsters Local No. 310 v. Ingrum (In re Tucson Yellow Cab Co.)</u>, 789 F.2d 701, 703 (9th Cir. 1986); <u>Lines v. Sys. Bd. of Adjustment No. 94 Bhd. of Ry., Airline & S.S. Clerks (In re Health Maint. Found.)</u>, 680 F.2d 619, 621 (9th Cir. 1982) (applying § 64(a)(1) of the former Bankruptcy Act, now § 503(b)(1)(A)(i)). However, the lump-sum severance payment at issue here does not fall into either one of these categories. It

-15-

provided for severance on termination without cause, with no mention of length of service or a notice period. We faced this same issue in <u>Dullanty v. Selectors, Inc. (In re Selectors, Inc.)</u>, 85 B.R. 843, 845-46 (9th Cir. BAP 1988):

> Despite the apparent simplicity of the severance pay rule, the result in the instant case is not obvious. First, the parachute clause in the case at bar is not like the provisions in the cases cited above. In those cases, the severance pay clauses provided compensation based upon what the employee would have earned during a specified period prior to termination. <u>See</u> <u>Tucson Yellow Cab</u>, 713 F.2d at 703 (two weeks notice or two weeks pay); <u>Health Maintenance</u>, 680 F.2d at 620 (specified number of days pay based on length of employment); <u>Mammoth Mart</u>, 536 F.2d at 952 (one [week's] salary per year of employment); <u>Straus-Duparquet,</u> 386 F.2d at 650 (one or two weeks pay); <u>Public Ledger</u>, 161 F.2d at 771 (specified number of weeks pay depending on the length of employment). (Footnote omitted).

> The parachute clause in the instant case is unlike any of these provisions: It does not provide compensation based upon salary during employment; nor does it mention or base compensation upon any notice period or length of employment.

> . . .

> In our view, the parachute clause in the instant case is so different from the severance pay provisions addressed in the Ninth Circuit cases, that it should not be forced into either category.

We held that in cases with severance or "parachute" clauses like the one at issue here, the Ninth Circuit severance pay rules are inapplicable, and instead such clauses should be subjected to analysis under § 503(b)'s standards — does the severance clause give rise to an actual and necessary expense of preserving the estate? <u>Id.</u> at 846.

We recognize authority exists which dictates that employees shall receive compensation on a quantum meruit basis for services rendered postpetition for the time period before an executory

contract has been assumed or rejected:

> If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, which depending on the circumstances of a particular contract, may be what is specified in the contract.

NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531 (1984). This "reasonable value of services" standard appears to be what the bankruptcy court applied to both the 2011 bonus claim and the severance claim. While this may be the proper standard to apply for compensation consisting of wages or something akin to wages when a contract has not yet been assumed or is non-existent, it does not apply to severance claims.

A claimant's right to a lump-sum severance payment should be analyzed under the general rules governing administrative expense priority. In re Selectors, Inc., 85 B.R. at 846; Bachman v. Commercial Fin. Servs., Inc (In re Commercial Fin. Servs., Inc.), 246 F.3d 1291, 1293-94 (10th Cir. 2001)(applying § 503(b)'s "actual and necessary" test to executives' lump-sum severance claims); Klemick v. Able Labs., Inc., 2007 WL 952030, at *5 (D.N.J. Mar. 28, 2007)(same); In re Big M, Inc., 2014 WL 2442940, at *4 (Bankr. D. N.J. May 30, 2014)(same); In re Ellipso, Inc., 2012 WL 827103, at *3 (Bankr. D.D.C. Mar. 9, 2012)(employment contract not assumed; court applied "reasonable value" test to executive's wage claim, but applied § 503(b)'s "actual and necessary" test to executive's severance claim); In re M Group, Inc., 268 B.R. 896, 902 (Bankr. D. Del. 2001)(applying "actual and necessary" test under § 503(b) to executive's lump-sum severance claim); In re Uly-Pack, Inc., 128 B.R. 763, 766-69 (Bankr. S.D.

-17-

Ill. 1991) (employment contract of chapter 11 debtor's former CEO was terminated postpetition when case was converted to chapter 7 and assets were sold by trustee; court applied § 503(b) analysis to severance claim but determined it was entitled only to the status of a general unsecured claim under § 502(b)(7)).

In determining whether the claimant's severance claim is entitled to priority as an administrative expense, the bankruptcy court must consider: (1) was the severance provision the result of a transaction with the debtor in possession; and (2) was the consideration supporting the claimant's right to severance beneficial to the debtor's operation of its business. In re Selectors, Inc., 85 B.R. at 846; In re Commercial Fin. Servs., Inc., 246 F.3d at 1294-95; Klemick, 2007 WL 952030, at *5; In re Big M, Inc., 2014 WL 2442940, at *4-5; In re Ellipso, Inc., 2012 WL 827103, at *3; In re M Group, Inc., 268 B.R. 896, 902 (Bankr. D. Del. 2001); In re Uly-Pack, Inc., 128 B.R. at 766. See generally In re BCE West, L.P., 319 F.3d at 1172 (claimants seeking payment of an administrative expense claim must show the debt arose from a transaction with the debtor and directly and substantially benefitted the estate).

One could argue that In re Tucson Yellow Cab Co., Inc., 789 F.2d at 703-05, suggests that Meruelo's severance claim could be analyzed under a "reasonableness" or "quantum meruit" theory. In Tucson Yellow Cab, a collective bargaining agreement between the taxi drivers and the company provided for two weeks notice prior to termination or severance pay in lieu of notice. Id. at 703. The CBA was ultimately rejected by the estate; the taxi drivers were terminated by the new owner several days thereafter.

-18-

The taxi drivers sought administrative priority for their severance claims. Id. The Ninth Circuit held that severance pay in lieu of notice was entitled to administrative priority under § 503(b)(1)(A), as long as such pay was owed by contract or in quantum meruit — i.e., when the contract no longer exists at the time of termination. Id. Because the CBA at issue was no longer in existence on the date of termination, the court allowed the two-week pay severance claims as administrative claims on a quantum meruit basis. Id. at 704.

We distinguish Tucson Yellow Cab, which was largely decided on equitable grounds. First, Meruelo's severance payment is not "pay in lieu of notice." Further, the clear intent of the CBA was to compensate the taxi drivers for at least two weeks before termination, either by giving them two weeks notice, after which the drivers would presumably work two more weeks and be paid, or to pay them two weeks severance pay and terminate them immediately. Therefore, the "pay in lieu of notice" was clearly a component of compensation — a payment akin to wages. See In re Commercial Fin. Servs., Inc., 246 F.3d at 1296. The severance claim at issue here is not a component of wages subject to a "reasonable value" analysis. Meruelo was paid his normal wages and, ultimately, his bonuses for the time he worked for Debtor postpetition. The lump-sum severance payment is an entirely separate claim and subject to the general rules governing administrative expense priority under § 503(b).

From our review of the record, we conclude the bankruptcy court abused its discretion by applying an incorrect standard of law when analyzing Meruelo's severance claim. It was not subject

-19-

to a "reasonableness" standard, but rather the "actual and necessary" standard set forth in § 503(b). Accordingly, we must VACATE and REMAND.

## VI. CONCLUSION

Because the bankruptcy court applied an incorrect standard of law, we VACATE and REMAND the Compel Order, in part, so the court can consider the severance claim under the proper legal standard.